Catron, Ch. J.
delivered the opinion of the court, (a)
The grant, to fix the boundary of which produced this suit, was made in 1793 to J. G. and Thomas Blount, for 500Q acres in the middle district, on both sides of Duck river, beginning opposite the mouth of the War Trace *35 fork, at a walnut and plum tree, running west 894 poles to a white oak; thence south 894 poles to a stake, crossing Duck river; thence east 894 poles to a stake; and thence north 894 poles, crossing the south fork, to the beginning.
The second call, south to a stake, crossing Duck river, produced the controversy. The distance called for (894 poles,) stops 332 poles short of the river. To this Whiteside claims to go. To resist this assumption, the defendant relies upon processioning lines marked for the 5000 acre tract in 1808; and mainly upon the fact of the remarking, depends the cause. On the opening of the Duck and Elk river country, the 5000 acre grant belonged to John Overton and Jenkin Whiteside. In February 1808, they caused it to be processioned by Malcolm ■Gilchrist, a deputy surveyor of the second district, in . conformity to the 21st section of the land law-of 1806. This survey was made with uncommon particularity. The first comer at the mouth of the War Trace fork, of course was found; then running west, the white oak comer was found. But this was all the marking, save some poles west from the beginning, a marked line was found. Gilchrist run south, marked the western boundary plainly, and made the south-west corner upwards of 300 poles short of Duck river; then run east, and marked the southern side of the tract, and made the south-east corner; then north to the beginning, marking the east side. This done, he proceeded to partition the tract between Over-ton and Whiteside, according to a covenant to divide between them, and by their instructions. The tract was laid off into four lots, partition deeds made, and these and the processioning survey registered.
The boundary seemed to be settled, and was recognized as the true one by Whiteside and Overton, until some time about 1816 or 1818, when Mr. Whiteside claimed the second line to run across Duck river, on the call in the grant, south S94 poles to a stake, crossing Duck river. *36 In the survey Gilchrist made, there is a surplus of 727 acres, over the five thousand, and to extend the line to the 30uth bank of Duck river, would add 1827 acres more, making the grant contain 7554 acres. These facts have been stated to show that the present case forms no exception to the universal truth, that where the grantee or owner makes newlines for himself, none having been originally marked in fact, he is sure to include as many acres as the grant calls for. So far as my knowledge of remarking, or rather marking of lines for granted lands, extends, I have not known, or have I ever heard, of any claimant laying off to himself too few acres. This is not stated as a reproach, but as a fact, on which are based important considerations in fixing the general rule, that where the state fails to have marked the boundaries of a grant, the grantee may do it for himself, conforming reasonably to the calls; and the state is estopped-to deny the correctness of the boundary thus fixed; the lines made standing on the foot of agreement between the state and the grantee. The state being bound by the agreement, of course the grantee is equally bound, estoppel being reciprocal. Com. D. Estoppel B.
The imposing necessity of the re-marking doctrine, and the wisdom of a rigid adherence to it, is more manifestly apparent from this case, than it has been from any other that has come before this court. The Duck and Elk river country was surveyed and granted in opposition to the wishes of the Cherokees; it was mainly productive of Indian hostilities for many years. The consequence was, that the lands generally were not surveyed in fact, but some times one corner, some times two made; and hardly in a single instance more done, than to run a straight forward line, and make locations on each side of it, as was obviously the case in the present instance. Often, however, the surveyor in the most concealed manner could only mark a single corner at a notorious place, or call for the fork of a stream, or the like, and make many lo *37 cations binding on each other, resting for identity on the same corner. The grants conformed, although no survey in fact ever had been made.
To lands thus situated, the owner, about 1808 caused the lines and corners to be marked. •- The country was covered with a cane-brake; such a thing as running a straight line, or obtaining accurate measure', was .hardly possible, and not expected. The presumption was, the grantee or owner would at least do even-handed justice-to himself, and if there was a mistake the State should suffer. As a protection, by the 21st section of the act of 1806, she provided her own sworn officer shoul.d procession. On processioning surveys depends the boundaries, with few exceptions, of all the old grants in 'a large section of the country. The object of the legislature ' was to substitute the new survey for the one that ought to have been made before the grant issued. The policy was not only wise, but of imperious necessity; and the necessity of forcing the claimants to adhere to thes’e surveys as if made before the grants issued, is great. . Suppose we permit the grantee to say, “I was twenty five years since mistaken; I have found and can prove my true corner, originally made for my land, before the grant issued, and to which it refers; it stands an hundred poles east of my proces- . sioned corner, and twenty north.” He at pleasure abandons the-lines made in 1808, and goes to the old corner. The next tracts east and south, call to begin at his southeast corner; others again depend on these, forming a connection. Of course, all must change place. The act of limitations cannot help the case. Could any imaginary evil be more fearful? The country is densely populated for its age. Tl?i‘; sliding of grants would sWeep the foundation of titles from under whole neighborhoods. The graveyard, (as in Davis vs. Smith and Tarpley,) the house, the barn and the orchard, enjoyed for twenty-five years, swept away in a day by the discovery of the old and true corner. This is not a mere fancy; jt:is a sorry picture *38 ’ of what the reality must be, consequent upon the recognition of the doctrine, that the boundaries made in 1808, may be abandoned by the now claimants. If you can go to the old corner, why not abandon the lines made in 1808 based upon the marked beginning, and go to mathematical and horizontal admeasurement? It can be assumed for a certainty, that not one precisely accurate survey of a large tract, or even a small one, has been made through a cane-brake, where ridges were passed over at one side, and none at the other: and if now the marks could be abandoned, and strict course and measure be applied, hardly an owner of land could hope to escape unhurt. The thing dare not be thought of; the very idea is pernicious, because calculated to stir up avarice and cupidity for speculation upon mistakes, real or supposed. With the present privilege of entering lands in the county offices for the fees only, the prowling sharper would enter and compel his neighbor to buy his own house, fearing the uncertainty of the compass and chain, of which he was ignorant. Men rely on their corners and lines; all the family know the marks; what is within them they feel to be theirs; it is the feeling of home; if not the most, one of the most virtuous and consolatory that falls to the lot of man. To permit it to be disturbed by threatened invasion from any and every quarter, would be as cruel as it would be unwise, and must not be. As before remarked, no instance is known where actual injury has been done the grantee by fixing boundaries pursuant to the act of 1806; and therefore, on the score of even-handed justice, as between the State and the grantee, no reason exists why the latter should not be estopped to disaffirm his boundaries thus made. That the State is bound we have often holden. In Williamson’s heirs against Buchanan, (2 Ten. Rep. 283,) the first case, the court sustained the old grant on the assumption that the new marks must be presumed to have been made where old ones had been, but viere lost by time. Hence the term “re-marking.” *39 This was in 1814. But when the true corner was found, oi course the presumption was rebutted.
In 1818, at Sparta, the case of Clark’s lessee vs. M’-Elhanie presented this aspect. Clark called to begin about a mile west of the mouth of the Calf Killer at a black oak. The tree was not found. The six hundred and forty acres were run out and marked beginning one mile west. M’Elha-nie entered two hundred acres on the western side of the new survey. Then the comer was found, standing west of the mile point. To run out from this the six hundred and forty, included M’Elhanie. It was a most striking case, where there was good faith on either side. New enterers after the corner was found, attempting to press Clark west, and M’Elhanie holding him to his processioning lines. Whether the survey had been made in strict conformity to the act of 1806, I do not now recollect; though I know Major Taylor, the regular surveyor, made it, and at Mr. Clark’s request, and that the lines were notoriously claimed by Clark as his until the corner was found. Clark had a verdict below. The Supreme Court reversed it, Haywood delivering the opinion; in which it was assumed, I imagine for the first time in the State, that Clark could not disaffirm his survey and go to the old corner to the prejudice of M’Elhanie; that the State was clearly bound by the new marked lines, they being in reasonable conformity to the grant; that the State being bound, of course the other party to the contract, the grantee, was equally bound, on the foot of estoppel. The position brought the doctrine within a maxim, and was conclusive. It was well settled, the State in such case would be bound. From this decision the idea was taken of incorporating the principle in the land law of 1819, authorizing new surveys, and making them conclusive. This court, in M’Lemore and others against Brown, maintained the binding force of the law; holding, that when the grantee made his new survey, and claimed to it, though the old corners were found, he could not be dis *40 turbed by a new enterer, and of course was estopped to claim the old corners; that he or the State could not blow hot at one time and cold at another, as was the expression of Judge Haywood, in Clark vs. M’Elhanie. I decided the cause to this effect in the chancery court at Jackson, and Judge Peck, with Judge Turley as special Judge, affirmed the decree. Neither of the above decisions have been reported. The circuit judges had before them the reported case of Williamson vs. Buchanan, and Davis vs. Smith and Tarpley, in which it is declared, that it should be presumed the recent line marks were a renewal of the old ones: resting the doctrine on such a presumption. Of course, when the old lines and corners were found, as in M’Elhanie’s and M’Lemore’s cases, the presumption was rebutted and destroyed.' So the circuit court charged in Davis vs. Smith and Tarpley, (1 Yerg. Rep. 498,) and the jury found the old corner the true boundary. This court in 1831 reversed the judgment, and declared the grantee and the State estopped to disaf-firm the new lines. The cause before the court was decided below in 1830, and of course without a knowledge of the leading adjudications on this subject. The charge was wrong; the judgment will be reversed, and the cause remanded for another trial, when the jury will be charged according to this opinion.
Judgment reversed.

 Absent, Whyte, J.